Slip Op. 09-136

UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| ASSOCIATION OF AMERICAN SCHOOL PAPER SUPPLIERS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Before: Richard K. Eaton, Judge |
| | : | |
| UNITED STATES, | : | Consol. Court No. 06-00395 |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| KEJRIWAL PAPER LIMITED, | : | |
| | : | |
| Deft.-Int. | : | |

OPINION

[United States Department of Commerce's final results of redetermination pursuant to remand in the antidumping investigation of certain lined paper products from India are sustained.]

Dated: December 10, 2009

*Wiley Rein LLP* (*Alan H. Price*, *Timothy C. Brightbill*, and *Maureen E. Thorson*), for plaintiff Association of American School Paper Suppliers.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*John J. Todor*); Office of Chief Counsel for Import Administration, United States Department of Commerce (*Sapna Sharma*), of counsel, for defendant United States.

*deKieffer & Horgan* (*J. Kevin Horgan* and *Gregory S. Menegaz*), for defendant-intervenor Kejriwal Paper Limited.

Eaton, Judge:  This consolidated action[1] is before the court

following remand to the Department of Commerce ("Commerce" or

"the Department") as provided for in the court's Opinion and

Order dated November 17, 2008.  *See Ass'n of Am. Sch. Paper*

*Suppliers v. United States*, 32 CIT __, Slip Op. 08-122 (Nov. 17,

2008) (not reported in the Federal Supplement) ("*Association I*");

Final Results of Redetermination Pursuant to Court Remand (Dep't

of Commerce Mar. 16, 2009) ("Remand Results").  Plaintiff

Association of American School Paper Suppliers (the

"Association") and defendant-intervenor Kejriwal Paper Limited

("Kejriwal") each object to the Remand Results, though for

different reasons.  *See* Plaintiff's Comments Resp. Remand Results

("Pl.'s Comments") 1-2; Defendant-Intervenor's Comments Resp.

Remand Results ("Def.-Int.'s Comments") 2-3.

The Remand Results relate to the treatment of general and

administrative ("G&A") expenses provided for in the Department's

earlier final results in its antidumping investigation of certain

lined paper products ("CLPP") from India, covering the period of

investigation ("POI") July 1, 2004, through June 30, 2005.  *See*

CLPP from India, 71 Fed. Reg. 45,012, 45,012 (Dep't of Commerce

Aug. 8, 2006) (notice of final determination of sales at less

---

[1]  This action includes court numbers 06-00395 and 06-00399.  *See*
*Ass'n of Am. Sch. Paper Suppliers v. United States*, Consol. Ct.
No. 06-00395 (Feb. 26, 2007) (order granting consent motion to
consolidate cases).

than fair value and negative determination of critical

circumstances) and the accompanying Issues and Decision

Memorandum (Dep't of Commerce Aug. 8, 2006) ("Issues & Dec.

Mem.") (collectively, the "Final Results").  On remand, the

Department has reduced Kejriwal's antidumping duty margin from

3.91 percent to 3.06 percent.  Remand Results at 1.

Jurisdiction is had pursuant to 28 U.S.C. § 1581(c) (2006)

and 19 U.S.C. § 1516a(a)(2)(B)(i).  For the reasons set forth

below, the Remand Results are sustained.

BACKGROUND

In September 2005, the Association, an "*ad hoc* trade

organization" acting on behalf of the domestic paper industry,[2]

filed a petition with Commerce seeking the imposition of

antidumping duties on imports of CLPP.[3]  CLPP from India,

Indonesia, and the People's Republic of China, 70 Fed. Reg.

58,374, 58,374 (Dep't of Commerce Oct. 6, 2005) (initiation of

---

[2]  The Association consists of MeadWestvaco Corporation, Norcom, Inc., and Top Flight, Inc.  *Association I*, 32 CIT at __, Slip Op. 08-122 at 3 n.2.

[3]  CLPP refers to "[paper] products . . . [such] as single- and multi-subject notebooks, composition books, wireless notebooks, looseleaf or glued filler paper, graph paper, and laboratory notebooks . . . ."  CLPP From India, 71 Fed. Reg. 19,706, 19,707 (Dep't of Commerce Apr. 17, 2006) (notice of preliminary determination of sales at less than fair value) (footnotes omitted).

Case 1:06-cv-00399-RKE Document 26 Filed 12/10/09 Page 4 of 25

Consol. Court No. 06-00395                                    Page 4

antidumping duty investigation). Thereafter, Commerce commenced

its investigation, and in accordance with its procedures,

conducted a verification of Kejriwal's operations. *See* Final

Results, 71 Fed. Reg. at 45,012. Commerce's verification

examined the company and found that its primary business was not

producing and exporting the subject CLPP, but rather trading

newsprint. *See* Issues & Dec. Mem. at 6. Commerce's verification

report "explained that Kejriwal finds suppliers and purchasers of

newsprint in the domestic market, and negotiates purchase and

sale prices with the manufacturers and purchasers of newsprint."

Memorandum to File from Laurens van Houten re: Verification of

the Cost Response of Kejriwal Paper Limited in the Antidumping

Investigation of Lined Paper from India at 4-5 (Dep't of Commerce

June 13, 2006) (the "Verification Report").

The Department concluded that Kejriwal incurred "significant

expenses" in financing and conducting its newsprint transactions,

but that, as a strategic business decision, it did not take title

to or possession of the newsprint so that it might "take

advantage of a 16 percent tax exemption offered by the Government

of India if newsprint 'is supplied directly from the manufacturer

to the end consumers.'" Verification Report at 8.

### STANDARD OF REVIEW

The court reviews the Final Results under the substantial

evidence and in accordance with law standard set forth in 19

U.S.C. § 1516a(b)(1)(B)(i) ("The court shall hold unlawful

any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise

not in accordance with law . . . ."). "Substantial evidence is

such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Huaiyin Foreign Trade Corp.*

*(30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003)

(quotation omitted).


### DISCUSSION

I.   Kejriwal's General and Administrative Expense Ratio

The sole issue on remand is Commerce's calculation of

Kejriwal's G&A expense ratio.[4]  This ratio is the component of

---

[4]  If Commerce cannot determine the normal value of imported
merchandise from home market or third country sales, it uses a
"constructed value" of the subject merchandise as the normal
value.  *See* 19 U.S.C. § 1677b(a)(4); *see also Bridgestone*
*Americas, Inc. v. United States*, 33 CIT __, __, 636 F. Supp. 2d
1347, 1356 (2009).  The constructed value is calculated by
applying a statutory formula that requires Commerce to total:
"the cost of materials and fabrication or other processing of any
kind employed in producing the merchandise;" "the actual amounts
incurred and realized by the specific exporter . . . for selling,
general, and administrative expenses in connection with the
production and sale of a foreign like product;" and "the cost of
all containers and coverings . . . incidental to placing the
                                                  (continued...)

constructed value by which Commerce computes[5] a part of a

company's overhead expenses. *Association I*, 32 CIT at __, Slip

Op. 08-122 at 37.  These are expenses, incurred during the period

of investigation, "which relate indirectly to the general

operations of the company rather than directly to the production

process."  *See* Section D: Cost of Production and Constructed

Value Questionnaire at D-18, *available at*

http://ia.ita.doc.gov/questionnaires/20080402/q-inv-sec-d-040108.

pdf (last visited Nov. 18, 2009).  They "include amounts incurred

---

[4](...continued)
subject merchandise in condition packed ready for shipment to the
United States."  19 U.S.C. § 1677b(e)(1), (2)(A), (3).

In addition, the statute directs that

> [c]osts shall normally be
> calculated based on the records of
> the exporter or producer of the
> merchandise, if such records are
> kept in accordance with the
> generally accepted accounting
> principles of the exporting country
> (or the producing country, where
> appropriate) and reasonably reflect
> the costs associated with the
> production and sale of the
> merchandise.

19 U.S.C. § 1677b(f)(1)(A).  The statute, however, "provides no
further guidance" or methodology for calculating general and
administrative expenses.  *Am. Silicon Technologies v. United
States*, 334 F.3d 1033, 1037 (Fed. Cir. 2003).

[5]  The G&A expense ratio is multiplied by the cost of manufacture
in order to obtain an amount for G&A expenses.  *Fuyao Glass
Indus. Group Co. v. United States*, 29 CIT 109, 131 n.12 (2005)
(not reported in the Federal Supplement).

for general [research and development] activities, executive salaries and bonuses, and operations relating to [a] company's corporate headquarters." *Id.*

II.  Commerce's Original Calculation of the G&A Expense Ratio

In the Final Results, Commerce departed from its usual methodology for calculating the G&A expense ratio:

> The Department's longstanding methodology is to calculate a ratio by dividing the company's general expenses by its total cost of sales, as reported in the respondent's audited financial statements. The Department's established practice in calculating the G&A expense rate is to include only those items that relate to the general operations of the company as a whole in the numerator of the G&A expense ratio calculation.

Remand Results at 6 (citation omitted). Because Kejriwal's business had both a CLPP manufacturing side and a newsprint trading side, Commerce found that its longstanding methodology would not produce an accurate result since Kejriwal never took title to the newsprint it traded. *See* Issues & Dec. Mem. at 5. As a result of Kejriwal not taking title to the newsprint, the cost of its purchase was not contained in the company's financials. That being the case, under Commerce's usual methodology, the cost of sale number (or cost of goods sold) for the traded newsprint in the ratio's denominator would be zero, and hence nearly all of the G&A expenses would be attributed to

the manufacture of CLPP.  This would be the case even though it
was clear that some large portion of the G&A expenses should be
attributed to the newsprint business.  Thus, as the Department
explained on remand:

> The unique business model of Kejriwal,
> where its two main lines of business include
> one in manufacturing (e.g., lined paper) and
> one in trading (e.g., acting as a broker in
> the sales of newsprint between two third
> parties) does not fit squarely with our
> normal approach for allocating financial
> statement classified G&A expenses over the
> financial statement classified cost of sales
> of manufactured products.  The Department
> recognized in this case that Kejriwal's
> primary business activity was as a newsprint
> trader.  Kejriwal acted as a broker between
> purchasers and suppliers of newsprint prior
> to and during the POI.  Kejriwal began
> producing lined paper during the POI.  The
> Department also recognized that many of
> Kejriwal's employees were involved in the
> newsprint trading activity.  Because Kejriwal
> had many employees and offices dedicated to
> the newsprint operation, during verification
> the Department questioned where the newsprint
> trading operation related expenses were
> recorded.  At verification, the Department
> reviewed all of the company's expenses to
> determine whether the expenses had been
> appropriately included in the reported costs
> or excluded.

Remand Results at 6-7 (citations and footnote omitted).

In other words, because the specific expenses associated
with the cost of the newsprint business were not separately
identified in Kejriwal's audited financials, the Department
decided to depart from its usual methodology:

        The Department found that most expenses
reported on Kejriwal's G&A Expense Ratio
Worksheet could be categorized as
manufacturing expenses, packing expenses,
selling expenses, interest expenses,
investment related expenses, or G&A expenses.
If the Department identifies expenses that
are directly related to one process or
product, it normally and more appropriately
considers those to be manufacturing costs.
By contrast, G&A expenses by their nature are
indirect expenses incurred by the company as
a whole, and are not directly related to a
particular process or product.  These general
expenses usually include corporate expenses
such as salaries and benefits, rent, travel
expenses, electricity, vehicle expenses,
insurance, transport expenses, and audit
expenses.

        We found unique circumstances in this
case because the respondent reported, and we
verified, that a large part of the company's
G&A expenses reported in the company's
financial statement resulted directly from
the trading of newsprint, rather than from
the general operations of the company.  Put
another way, although these costs were
reported as G&A expenses on the income
statement, they were nonetheless costs
directly related to Kejriwal's newsprint
trading operations and were not supporting
the general operations of the company as a
whole (e.g., expenses for payroll and
accounting supported the company as a whole,
while expenses for newsprint marketing
salaries were directly related to the
newsprint trading operation).

*Id.* at 7-8 (citations and footnotes omitted).

As a result of these findings, Commerce modified its

methodology by looking closely at Kejriwal's G&A expenses, as

reported in its financials, in order to determine if any of these

expenditures were directly attributable to the trading of
newsprint.  *Id.* at 8-9.  The Department did this because it
believed that these expenses would be more accurately
characterized as "costs of sales" of the newsprint business
rather than general company expenses.  Commerce then moved these
values from the numerator to the denominator of the G&A expense
ratio.  *Id.* at 9.

     In *Association I*, the court did not question Commerce's
revised methodology, but found lacking Commerce's explanation for
not including an amount for the cost of the newsprint traded in
the denominator when calculating the G&A expense ratio.
*Association I*, 32 CIT at __, Slip Op. 08-122 at 49.  In this
connection, the court further sought an explanation as to why an
amount for newsprint traded had been included when calculating
the financial expense ratio.  *Id.* at 50.


III.  Commerce's Remand Results

     On remand, the Department has sought to explain its reasons
for: (1) declining to include a cost of newsprint traded in the
denominator when calculating Kejriwal's G&A expense ratio; (2)
moving additional costs from the numerator to the denominator
when calculating the ratio; and (3) including the cost of
newsprint traded in the denominator of the financial expense

ratio, but not in the G&A expense ratio.

Kejriwal, as it did with respect to the Final Results of the
investigation, disputes Commerce's calculation of its G&A expense
ratio by insisting that the Department must include the cost of
newsprint traded in the ratio's denominator.

> The Department's claim that it has
> attempted to associate reported expenses with
> the general and administrative activities of
> the whole company continues to be
> contradicted by the immutable facts of the
> administrative record.  While the Department
> reasonably accommodated the economic reality
> of Kejriwal's business activity so that the
> purpose of the finance ratio would not be
> thwarted, the Department continues to blind
> itself to the same economic reality in
> dramatically understating the G&A ratio
> denominator by not including a reasonable
> equivalent cost of the newsprint.

Def.-Int.'s Comments 2.  Thus, Kejriwal argues that, by not
including the cost of newsprint traded in the G&A expense ratio's
denominator, Commerce "can never arrive at a 'fair equivalent
value' of [the newsprint] trading activity."  Def.-Int.'s
Comments 18.

For its part, the Association maintains that:

> Consistent with the Department's past
> practice, Kejriwal's G&A ratio should be
> based on its [cost of goods sold] as
> established in its normal books and records.
> These costs do not include the cost or value
> of traded newsprint, because no such cost was
> ever incurred.  Rather than second-guessing
> the company's own auditors, and the company's
> own decision as to its business model and
> structure, the Department should follow its

> precedent with respect to the calculation of
> [cost of goods sold], and should be directed
> to include only those costs that can be
> directly associated with manufacturing
> processes and products.

Pl.'s Comments 8.  In other words, the Association argues that
the Department should have adhered to its usual practice and kept
all of G&A expenses reported on Kejriwal's financial statements
in the numerator and allocated none to the denominator.  Pl.'s
Comments 7.

    The Department continues to cite Kejriwal's unusual business
model as a justification for departing from its methodology of
relying on the characterization of costs found in a company's
financial records when constructing the G&A expense ratio.

> We deviated from our normal methodology
> for both financing expense and G&A ratios due
> to the problems posed by the unique business
> model of Kejriwal's newsprint trading
> business.  Following our normal method of
> allocating company-wide financing or G&A
> expense over company-wide actual cost of
> sales as reported on the income statement
> would have resulted in an unreasonable
> allocation of all financial and G&A expenses
> as reported on the income statement to lined
> paper because 1) Kejriwal's financial
> statement cost of sales consisted solely of
> lined paper expenses (understating the
> denominator) and 2) its reported G&A expenses
> included expenses directly related to
> newsprint operations (overstating the
> numerator for the G&A expense ratio).  This
> is because the newsprint trading business is
> an administrative-type operation while the
> lined paper business is a manufacturing
> operation.  As a result, Kejriwal classified
> all newsprint trading costs as G&A in

> Kejriwal's financial statements, and all
> lined paper costs as the only element in the
> cost of sales in its financial statements.
> Our normal method of allocating G&A and
> financing costs would have resulted in
> virtually all such costs being allocated to
> lined paper.

Remand Results at 15-16.

Thus, as part of its remand procedures, Commerce again took

a close look at the amounts reported as G&A expenses in

Kejriwal's financials.

> For the G&A ratio calculation, we
> attempted to reasonably identify and
> segregate those administrative costs that
> directly relate to Kejriwal's newsprint
> trading operation from those costs relating
> to the general operations of the company as a
> whole, based on Kejriwal's classification and
> description of the expenses.  We excluded
> those costs identified by Kejriwal as
> newsprint trading costs from the G&A
> numerator and included them in the cost of
> sales denominator.  *In effect, the costs*
> *associated with Kejriwal's newsprint*
> *operations are the cost of its newsprint*
> *trading sales.  While these expenses may have*
> *been administrative in nature, as described*
> *above, and we typically do not attribute*
> *administrative costs directly to specific*
> *products or divisions, we considered the*
> *facts and circumstances in this case to be*
> *unusual.  Specifically, these expenses were*
> *directly related to generating revenue in the*
> *company's trading activity (akin to the cost*
> *of sales of manufactured products)*, and
> accordingly, reasonably associated to
> Kejriwal's newsprint trading operations based
> on the analysis provided by Kejriwal at
> verification, and added to the denominator.
> In this sense, the Department's G&A
> calculation is consistent with its normal

> methodology for calculating G&A expenses,
> which is to allocate a company's expenses
> that relate to the general operations of the
> company over the company's total cost of
> sales.

*Id.* at 17 (emphasis added).

Indeed, its examination on remand revealed further expenses
the Department believed should be credited to the company's
newsprint business.

> During our reexamination of the record
> pursuant to the Court's remand, we realized
> that while we had allocated a significant
> amount . . . of the reported G&A to
> newsprint, certain administrative rent and
> administrative depreciation expenses had not
> been allocated to the newsprint trading
> operation.  For the remand determination, we
> have recalculated the G&A expense ratio to
> reflect a reasonable allocation of these
> expenses to newsprint trading because, like
> other expenses we examined, we consider some
> administrative rent and administrative
> depreciation expenses to be more properly
> considered directly related to newsprint
> trading operations.

*Id.* at 11.

Responding to Kejriwal's claim that the cost of newsprint
should have been included in the cost of goods sold, Commerce
explained that "Kejriwal did not incur or record an acquisition
cost for newsprint in its income statement because it did not
purchase or sell newsprint during the POI.  As a result, Kejriwal
did not have any newsprint [cost of goods sold]." *Id.* at 20.

Finally, the Department addressed its reasons for taking the

cost of the newsprint into account in the financial expense

ratio, but not the G&A expense ratio:

> [W]e recognized that including an imputed
> value for newsprint in the denominator of the
> financial expense ratio, while not an actual
> cost to Kejriwal, would be reasonable in
> allocating the company's financing expenses
> to its two main business operations
> (newsprint trading and lined paper) because
> Kejriwal incurred financing costs directly
> related to the value of the newsprint.   In
> other words, interest expenses incurred in
> the newsprint trading operations were
> dependent on the value of the newsprint
> traded.   Kejriwal borrowed money from lenders
> to both finance its lined paper
> manufacturing, and to finance its newsprint
> trading operations.   Since financing expenses
> reflect a company's cost of capital, we
> allocated such costs over the operating
> activities that required capital investment
> (i.e., lined paper manufacturing and the
> imputed value of the traded newsprint).

*Id.* at 16.

Put another way, the Department concluded that the expenses

incurred in financing the cost of the newsprint traded were

directly proportional to the value of the newsprint and would be

the same regardless of whether Kejriwal took title to the

newsprint or not.   This is because the interest expense for

financing the newsprint would not be any more or less if Kejriwal

actually purchased the paper or merely financed its sale and

purchase by others.   As a result, the Department accounted for

these expenses by adding an amount equal to the cost of newsprint

to the denominator of the finance expense ratio in order to
allocate these financing expenses to the newsprint trading
business.


IV.  Commerce's Remand Results Are Sustained

     Commerce is charged with computing a constructed value as
accurately as possible by including in its calculations an amount
for general and administrative expenses. *See Thai I-Mei Frozen
Foods Co. v. United States*, 32 CIT __, __, 572 F. Supp. 2d 1353,
1359 (2008) ("Commerce must be guided by the objectives of
achieving an accurate margin and a fair comparison between export
price and normal value."). Furthermore, Commerce must be able to
"provide[] a reasonable explanation" for how it arrives at its
final calculations. *Wuhan Bee Healthy Co. v. United States*, 32
CIT __, __, Slip Op. 08-61 at 7 (May 29, 2008) (not reported in
the Federal Supplement). This is particularly the case where the
Department departs from a previously employed methodology. *M.M.
& P. Mar. Advancement, Training, Educ. & Safety Program
(MATES) v. Dep't of Commerce*, 729 F.2d 748, 755 (Fed. Cir. 1984).
That Commerce reasonably has complied with these injunctions,
when confronted with a difficult factual situation, can be seen
by examining the proposed methodologies urged by Kejriwal and the
Association.

Here, the parties are disputing the amount of G&A expenses to be included in the constructed value. This amount is important because the greater the constructed value of a product, the greater the dumping margin.[6] Thus, the larger the percentage resulting from the G&A expense ratio, the greater the amount of G&A expenses to be added to constructed value. As a result, an increase in the denominator (where the numerator is either undisturbed or made smaller) is advantageous to Kejriwal because it results in a smaller constructed value.

Kejriwal would have Commerce increase the value of the G&A denominator by an amount equal to the value of the newsprint traded. The problem with this proposal is that it presupposes that, had Kejriwal actually taken title to the newsprint, it would have incurred no greater overhead expenses than those now found in its financials. In other words, Kejriwal would increase the value of the denominator of the G&A expense ratio without changing the numerator in any way.

Because Kejriwal never took title to or possession of the newsprint, however, there is simply no record evidence as to

---

[6] In antidumping investigations, Commerce must ultimately calculate a dumping margin, or "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A). If the price of an item in the home market (normal value) is higher than the price for the same item in the United States (export price), then the dumping margin comparison produces a positive number that indicates dumping has occurred.

whether Kejriwal would have incurred greater G&A expenses had it
held title to the newsprint. "Kejriwal did not take title to the
newsprint it traded [and] did not incur the associated costs . .
. ." Defendant's Reply Brief to Comments in Opposition to
Commerce's Final Remand Redetermination ("Def.'s Reply") 5.
Therefore, there is nothing on the record indicating whether
taking title to the newsprint would result in greater expenses
for such items as: corporate salaries and benefits, rent, travel
expenses, electricity, vehicle expenses, insurance, transport
expenses, or audit expenses. *See, e.g.*, Remand Results at 8
(listing these expenses as common G&A expenses). Any increase in
these expenses would necessarily result in the numerator of the
G&A expense ratio being made larger. Without record evidence
showing how the numerator of the G&A expense ratio would be
affected had Kejriwal taken title to the newsprint, constructing
a G&A expense ratio using Kejriwal's proposed methodology would
be guesswork.

As to the Association's proposal, it urges Commerce to
employ its usual methodology of taking the G&A values found in
Kejriwal's financials and placing them in the G&A expense ratio
without alteration. "Consistent with the Department's past
practice, Kejriwal's G&A ratio should be based on its [cost of
goods sold] as established in its normal books and records."

Pl.'s Comments 8.  This methodology, however, would disregard the
existence of the newsprint trading business entirely and would
result in nearly all of the G&A expenses being attributed to the
production of CLPP.  In other words, the Association wishes
Commerce to ignore the employees, offices, and activities related
to the newsprint business—an absurd result.

     Rather than accept either Kejriwal's or the Association's
proposed G&A methodologies, Commerce has chosen to take the
newsprint trading business as it found it.  That is, the
Department has not assumed that Kejriwal took title to the
newsprint, when it did not.  At the same time, Commerce did not
ignore the direct costs of the newsprint business altogether.

     Thus, Commerce has kept its usual methodology by putting
general expenses in the numerator of the G&A expense ratio and by
putting expenses directly related to the newsprint business in
the ratio's denominator.  While Commerce has departed from its
past practice by examining the expenses that Kejriwal identified
as general expenses in its financials, and found that some were
better categorized as direct expenses, it has given a complete
and reasonable explanation for having done so based on the
company's business model.

     The Department has also given a reasonable explanation for
further recharacterizing other amounts carried on Kejriwal's
books as G&A expenses.  During its reexamination of the record

pursuant to remand, Commerce found that certain rent and
depreciation expenses had not been allocated to the newsprint
trading operation.  Remand Results at 11.  Accordingly, for the
Redetermination, Commerce recalculated the G&A expense ratio and
allocated a portion of these expenses to the newsprint
operations, by moving them to the denominator of the ratio.  *Id.*
at 11-12.

With regard to the rent paid for administrative purposes,
because there was no identification of rent expenses directly
associated with the newsprint activity on Kejriwal's financials,
Commerce "approximated an amount based on the ratio of newsprint
salaries and remuneration to total financial statement classified
G&A salaries and remuneration."  *Id.* at 12 (citation omitted).
Commerce explained that it was reasonable "to use the verified
ratio of newsprint salaries to total salaries to allocate rent to
newsprint because the newsprint trading employees work in
Kejriwal's administrative offices for which rent is paid."  *Id.*
Commerce then used the percentage of total salaries devoted to
its newsprint business to "identif[y] a portion of the rent to be
allocated to the newsprint operation."  Def.'s Reply 8.  In other
words, Commerce used the resulting ratio to determine a
percentage of rent devoted to Kejriwal's newsprint trading
business.  The Department then moved the value of rent expense,

determined using this ratio, to the denominator of the G&A
expense ratio.  Commerce found that the use of this salary ratio
to be reasonable because the proportion of salaries devoted to
the newsprint business would provide an approximation of the
amount of rent paid to support the newsprint operation.  *Id.*

Considering that Commerce has found the newsprint business
to be largely administrative in nature, using administrative
salaries to approximate the proportion of administrative rent
directly related to the newsprint business is reasonable.  That
is, it is reasonable to assume that the salaries paid for the
administrative personnel working in the newsprint business would
be proportional to the amount of rent paid to house them.  As a
result, the court finds that Commerce's decision to place these
expenses in the denominator of the G&A expense ratio is both
reasonable and has been adequately explained.

In like fashion, Commerce identified a portion of the
depreciation expense to be allocated to the newsprint operations,
based on the percentage Kejriwal provided for the distribution of
motor vehicle depreciation expenses.  Remand Results at 13.  This
adjustment was made by using the percentage of automobile
depreciation attributable to newsprint trading to provide a
surrogate for the amount of administrative depreciation, as a
whole, attributable to newsprint trading.  Commerce explained

that Kejriwal had allocated administrative depreciation based on

motor vehicle expenses because the majority of its administrative

depreciation expenses were for motor vehicles.  *Id.*  Thus, the

Department took the percentage of motor vehicle depreciation

attributable to the newsprint business, and extended the use of

the percentage to all administrative depreciation.  Commerce then

took this portion of the administrative depreciation expense, and

moved it to the denominator of the G&A expense ratio calculation.

*Id.*

Because Commerce had the actual percentage of motor vehicle

use for the newsprint trading business, it was able to calculate

the percentage of motor vehicle depreciation attributable to

newsprint trading.  The court finds that the extension of this

treatment to all other property subject to administrative

depreciation for which there is no breakdown in the financials

between the CLPP business and the newsprint trading business is

reasonable considering that motor vehicle depreciation made up

the bulk of administrative depreciation expenses.

Finally, the court finds that Commerce has supplied a

reasonable explanation for treating the cost of newsprint traded

differently in the financial and G&A expense ratios.  That is,

while it can be said that the cost of financing its newsprint

trading business would be the same whether Kejriwal actually took

title to the newsprint or not, the same cannot be said of the amount of G&A expenses that would be incurred had Kejriwal actually purchased the newsprint.  Thus, it is reasonable to account for the expense of financing the newsprint in the financial expense ratio by including an amount equal to what it would cost to buy it.  There is simply no record evidence to justify similar treatment in the G&A expense ratio.

Having reviewed Commerce's findings and reasoning, the court concludes that Commerce supported with substantial evidence, adequately explained itself, and supplied the "reasoned analysis" necessary to depart from its normal practice when calculating the G&A expense ratio.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).

CONCLUSION

For the reasons stated, Commerce's Remand Results in the antidumping investigation of certain lined paper products from India are sustained.  Judgment shall be entered accordingly.

/s/ Richard K. Eaton

Richard K. Eaton

Dated:     December 10, 2009
           New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                              :
ASSOCIATION OF AMERICAN       :
SCHOOL PAPER SUPPLIERS,       :
                              :
          Plaintiff,          :
                              :
          v.                  :   Before: Richard K. Eaton, Judge
                              :
UNITED STATES,                :   Consol. Court No. 06-00395
                              :
          Defendant,          :
                              :
     and                      :
                              :
KEJRIWAL PAPER LIMITED,       :
                              :
          Deft.-Int.          :
_____:
```

<u>JUDGMENT</u>

Upon consideration of the papers and proceedings had herein, and in conformity with the court's decision in this matter, it is hereby

ORDERED that the Remand Results are sustained.  Accordingly, this case is dismissed.


                              ___/s/ Richard K. Eaton___

                                 Richard K. Eaton


Dated:     December 10, 2009
           New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____

Deputy Clerk